**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**GUY BRYAN**

      **Plaintiff,**

**v.**                                         **Case No. 1:22-cv-00158-SCY-JFR**

**CORECIVIC, INC., CHAD MILLER
(Warden) in his individual and official
capacities, KATHLEEN LAMPHERE,
NP, in her individual and official
capacities, KEITH IVENS, MD, in his
individual and official capacities, and
CENTURION DETENTION HEALTH
SERVICES, LLC,**

      **Defendants.**

## FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiff Guy Bryan, through undersigned counsel, brings this First Amended Complaint

for personal injuries and violations of his civil rights under the Eighth and Fourteenth Amendments

to the United States Constitution, Article II, Section 13, of the New Mexico Constitution, and 42

U.S.C. § 1983.

## INTRODUCTION

1.    Plaintiff Guy Bryan was an inmate at the Metropolitan Detention Center in

Bernalillo County and Cibola County Correctional Center in Milan, New Mexico.

2.    At both facilities Mr. Bryan had an obvious, non-healed fracture of his right

collarbone that was extremely painful and deformed the skin above his collarbone. This is a serious

medical condition.

3.    The deformed skin and the fact that the fractured pieces of his collarbone were no

longer touching meant that Mr. Bryan needed urgent evaluation by an orthopedic doctor.

1

4.     Mr. Bryan repeatedly told providers at both facilities that he needed treatment, evaluation, and that the Ibuprofen he was occasionally given was inadequate to quell the pain.

5.     Mr. Bryan's medical needs were dismissed and ignored at both facilities, and he spent over a year in unnecessary pain.

## PARTIES, JURISDICTION, AND VENUE

6.     Plaintiff Guy Bryan was incarcerated in Bernalillo County at the Metropolitan Detention Center in August and September 2019.

7.     Mr. Bryan was incarcerated in Cibola County at the Cibola County Correctional Center from January 2020 to December 2021.

8.     Mr. Bryan is currently incarcerated at a facility in California.

9.     Defendant CoreCivic, Inc. is a foreign for-profit corporation registered to do business in New Mexico with a registered agent for service of process at 2201 San Pedro NE Bldg.3 #200, Albuquerque, NM 87110.

10.     Defendant CoreCivic operates the Cibola County Correctional Center (hereinafter, "the Prison") in Millan, New Mexico, including operation of medical services in the Prison.

11.     At all times pertinent hereto, Defendant CoreCivic acted through its owners, officers, directors, employees, agents or apparent agents, including but not limited to administrators, management, nurses, nurse practitioners, doctors, technicians and other staff personnel and is responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency or apparent agency.

12.     All tortious conduct of individual Defendants Chad Miller, Kathleen Lamphere, NP, and Keith Ivens, MD hereinafter alleged is imputed to Defendant CoreCivic as a matter of law.

13.    Defendant Chad Miller was, at all times material, an employee of Defendant CoreCivic and the warden of the Prison in charge of the Prison's facilities and operations, including medical services, and was acting within the course and scope of his agency.

14.    Defendant Kathleen Lamphere, NP, was, at all times material, an employee of Defendant CoreCivic and a nurse practitioner at the Prison and was acting within the course and scope of her agency.

15.    Defendant Keith Ivens, MD, was, at all times material, an employee of Defendant CoreCivic and a medical doctor at the Prison and was acting within the course and scope of his agency.

16.    Defendant Centurion Detention Health Services, LLC is a foreign for-profit company registered to do business in New Mexico with a registered agent for service of process at 206 S Coronado Ave, Espanola, NM 87532.

17.    At all relevant times, Defendant Centurion Detention Health Services, LLC (hereinafter "Centurion") was contractually obligated to provide medical care to detainees and incarcerated individuals at the Metropolitan Detention Center (MDC) in Bernalillo County.

18.    At all times pertinent hereto, Defendant Centurion acted through its owners, officers, directors, employees, agents or apparent agents, including but not limited to administrators, management, nurses, nurse practitioners, doctors, technicians and other staff personnel and is responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency or apparent agency.

19.    This Court has jurisdiction under 28 U.S.C. §§ 1331, and 1343, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper under 28 U.S.C. § 1391, as, on information and belief, nearly all Defendants are residents of New Mexico, and the events complained of occurred in the District of New Mexico.

## FACTUAL BASIS

21.     Plaintiff Guy Bryan was attacked with a baseball bat on August 18, 2019. The assailant broke his right collarbone.

22.     The break created a displaced fracture of his collarbone, meaning the two pieces of bone were no longer touching or connected, but more-or-less floating loosely in his arm.

23.     The break occurred at the lateral, or distal, end of his collarbone, meaning the bones were separated closer to his right shoulder, rather than a separation in the middle of the bone, or closer to the sternum.

24.     A displaced distal fracture of the collarbone requires referral to a specialized provider, like an orthopedic doctor or orthopedic surgeon, for evaluation.

25.     The break also pressed fractured bone up against the underside of the overlying skin, a condition called "tenting," which risks the bone ripping through the skin, creating an open fracture.

26.     Tenting requires referral to a specialized provider, like an orthopedic doctor or orthopedic surgeon, for evaluation.

27.     The fracture caused Mr. Bryan constant pain, instability in the shoulder joint, and severely limited the use of his right arm.

28.     Mr. Bryan was incarcerated immediately after breaking his collarbone in August 2019, but Mr. Bryan did not receive the necessary orthopedic consult until August 3, 2020. He did not receive the collarbone surgery he needed for his injury until December 18, 2020.

29.     Mr. Bryan was first incarcerated at the Metropolitan Detention Center in Bernalillo County as a pre-trial detainee on August 18, 2019.

30.     When Mr. Bryan arrived at MDC around 11:00 pm, he was medically screened by Olivia Eubank, an EMT and employee of Defendant Centurion.

31.     Ms. Eubank recorded that Mr. Bryan had a broken clavicle and was experiencing 7 out of 10 pain.

32.     Ms. Eubank also noted that Mr. Bryan needed an urgent referral to a "medical provider" because of his broken clavicle.

33.     According to Defendant Centurion policy, the type of referral made—"Urgent I"— meant that Mr. Bryan should be seen the next business day, which was Monday, August 19, 2019.

34.     However, two hours after Ms. Eubank's evaluation, Mr. Bryan was medically screened again by Defendant Centurion employee Nazish Rizvi, LPN.

35.     In complete contrast to Mr. Bryan's medical records, Ms. Eubank's records, and the reality of Mr. Bryan's situation, Nurse Rizvi noted that Mr. Bryan had **no** medical complaints and required **no** referral to a medical provider.

36.     Just after midnight on August 20, 2019, Mr. Bryan expressed to Centurion providers that his right arm was in severe pain. He was prescribed one Tylenol pill but did not receive any other treatment for, or evaluation of, his collarbone.

37.     Mr. Bryan also initialed a "sick call" during this period, which is an inmate's request for medical care.

38.     Mr. Bryan did not receive his sick call request.

39.     Ultimately, Mr. Bryan did not receive any referral or any medical care for his collarbone at MDC from August 18 until he was released on August 23, 2019.

40.    A few days later, on September 3, 2019, Mr. Bryan returned to MDC.

41.    Defendant Centurion employee Denise Jones, RN, medically screened Mr. Bryan and noted in her visual observation that Mr. Bryan had injuries acquired two weeks earlier and that Mr. Bryan was experiencing 7 out of 10 pain.

42.    Nevertheless, Nurse Jones chose not to review Mr. Bryan's historical chart files and made no indication that Mr. Bryan might be suffering from a broken collarbone.

43.    Nurse Jones did not refer Mr. Bryan to a higher level of care.

44.    Mr. Bryan did not receive a referral or any medical care for his collarbone from September 3 until he was released on September 5, 2019.

45.    The lack of a referral to a more specialized provider meant Mr. Bryan did not receive physical therapy treatment or surgical evaluation, putting him at risk for a poor healing or non-healing fracture and putting him at risk for more invasive surgical treatment later.

46.    The lack of proper medical treatment and evaluation at MDC lead to prolonged pain, weakness, loss of use, and deformity.

47.    Mr. Bryan was taken into custody the Cibola County Correctional Center ("the Prison" owned and operated by Defendant CoreCivic) on January 31, 2020.

48.    As he had been complaining to providers at MDC since August 2019, Mr. Bryan told CoreCivic employee Andrea Dewey, RN, that he had a broken right collarbone, that he was in great pain, and that he was afraid the bone could rip through the skin at any moment.

49.    Ms. Dewey, RN recorded in Mr. Bryan's health pre-screening record that he had a fractured right clavicle "which is piercing the skin," that he had 6 out of 10 pain in the area, that his right arm was in a sling, and that he said he had never been seen for the injury.

6

50.     On February 5, 2020, an x-ray was taken of Mr. Bryan's right collarbone. The x-ray results indicated that there is a 5 mm gap where the bones are not touching and that there was "no apparent callus formation."

51.     "No apparent callus formation" is a sign that the facture is not healing.

52.     A nurse practitioner (NP) or medical doctor should know that an x-ray result of this type demands urgent evaluation by a more specialized provider, like an orthopedic surgeon.

53.     An untreated non-healing fracture puts a patient in unnecessary and nearly constant pain, and puts them at risk of life-long deformity, weakness, and other physical harm.

54.     A non-healing, displaced right collarbone fracture creates instability in the shoulder joint, leading to weakness, disuse, and atrophy of the right arm.

55.     Delay in treating a non-healing fracture increases the risk of a more complicated, more invasive surgery to fix the fracture later.

56.     A non-healing fracture is also known as a nonunion.

57.     Delay in evaluating and treating bone that is tenting the skin risks degradation in the skin, a puncture, conversion to an open fracture, and infection.

58.     Mr. Bryan's x-ray results were reviewed by Defendant Kathleen Lamphere, NP on February 13, 2020.

59.     Defendant Lamphere, NP determined that he should see her for examination of his right collarbone the next day.

60.     On February 14, 2020, Defendant Lamphere, NP saw Mr. Bryan and noted that he told her he needed surgery on his right collarbone.

61. Defendant Lamphere, NP assessed Mr. Bryan as having an "OLD fracture of right distal clavicle" (she supplied the emphasis on "old" in her note). She did not acknowledge that the fracture was not healing.

62. Defendant Lamphere, NP also noted that she told Mr. Bryan that "there is no surgical intervention for a fractured clavicle," which is not true.

63. Defendant Lamphere, NP further noted that Mr. Bryan "seemingly wanted to bully this NP into ordering a surgical consult" and that he said, "I want to see a surgeon." In response, she recorded that "NP again informed him that there is no surgery for a fractured clavicle."

64. A surgical consult, or at least consult by a higher level of care, was medically indicated by the February 5, 2020 x-ray result.

65. The tenting presentation and distal location of his fracture also warranted an orthopedic consult.

66. Nevertheless, after rendering as treatment only a prescription for Ibuprofen for the pain, Defendant Lamphere, NP ended her record of the February 14, 2020 visit by inserting a clear reference to her belief that Mr. Bryan was faking his injury: "[Mr. Bryan] then re applied the arm sling he had been wearing when he came into my office. He also was observed to put on his jacket without any difficulties, arose and walked out of medical on his own without any difficulty or impairment."

67. Following the February 14 visit, still in constant pain and hardly able to use his right arm, Mr. Bryan put in a request for medical treatment, known as a "sick call."

68. Mr. Byran was seen on March 5, 2020, by CoreCivic employee Leroy Leonard, NP, who noted decreased range of motion and weakness on his right side. Mr. Leonard, NP recommended that Mr. Bryan be referred for an orthopedic consult.

69.     Mr. Byran was not given a referral for an orthopedic consult at this time.

70.     On March 5, 2020, Mr. Bryan also requested a copy of his x-ray result from February 5, 2020.

71.     On April 15, 2020, Mr. Bryan submitted a request to providers at the Prison to release his medical records to a third party. As the reason for his request, he told the Prison that there was "a lack of and refusal of medical care."

72.     On April 21, 2020, Mr. Bryan again put in a sick call request.

73.     On April 25, 2020, he was seen by CoreCivic employee Natalie Klein, RN, who noted that he had been seen at the prior sick call and wanted a referral to orthopedics. Ms. Klein, RN then scheduled Mr. Byran to see Defendant Lamphere, NP again.

74.     On April 29, 2020, having at least two prior instances in the record that Mr. Bryan needed elevation to a higher level of care, instead of providing adequate treatment, Defendant Lamphere, NP forced Mr. Byran to give up his right arm sling.

75.     Guards later forcibly removed the arm sling from Mr. Bryan's possession.

76.     Defendant Lamphere, NP also noted again that she told Mr. Bryan, "There is no surgery for a fractured clavicle, there is no way to set a fractured clavicle." This is incorrect.

77.     Defendant Lamphere, NP made no note of Mr. Leonard, NP's recommendation for an orthopedic referral or Mr. Bryan's request for an orthopedic referral.

78.     Defendant Lamphere, NP's record on April 29, 2020 went beyond her belief that Mr. Bryan was merely malingering about his injury, she noted on April 29 that Mr. Bryan was delusional.

79.     She discussed her suspicion as to Mr. Bryan's delusion with another CoreCivic employee in the Prison's mental health clinic, which appears to have gone nowhere, because Mr. Bryan was not delusional. However, she did not elevate care for his broken collarbone.

80.     On April 29, 2020, after his visit with Defendant Lamphere, NP, Mr. Bryan submitted a written complaint to the Prison, explaining that he was trying to get medical treatment, which was ignored, and that he was punished for his attempt to get medical treatment by having his arm sling confiscated.

81.     On July 11, 2020, over five months after providers at the Prison had reason to know Mr. Bryan needed specialist evaluation for his fracture, Defendant Keith Ivens, MD finally ordered an orthopedic consult.

82.     Defendant Ivens, MD appears to have never evaluated Mr. Bryan at any time.

83.     It is unknown when the Prison actually requested the orthopedic consult with the University of New Mexico Hospital, but it was scheduled for August 3, 2020. The Prison did not submit a request to the US Marshals for approval of the consult until July 29, 2020.

84.     On August 3, 2020, Mr. Bryan was seen at the University of New Mexico Hospital (UNMH). An orthopedic resident doctor at UNMH diagnosed him with a nonunion (non-healing) fracture and recommended that Mr. Bryan be seen by an orthopedic surgeon and to perform physical therapy in the meantime.

85.     The Prison knew about this recommendation for surgical evaluation the same day it was made by UNMH.

86.     Nevertheless, the Prison inexplicably waited until August 19, 2020 to order a consult with an orthopedic surgeon.

87.     There is no indication the Prison provided physical therapy to Mr. Bryan.

10

88.     The surgical consult was scheduled with UNMH on September 10, 2020, where Mr. Bryan was given a two-month period to conduct physical therapy before a pre-operative surgical evaluation.

89.     On September 10, 2020, the Prison for the first time provided Mr. Bryan with a non-opiate pain killer, more powerful than over-the-counter Ibuprofen, which was more in line with the significant pain he was experiencing.

90.     On December 18, 2020, Mr. Bryan had an extensive surgery at UNMH where bony debris was removed from his collarbone, bone was harvested from his hip to implant on his collarbone, and eight screws were used to secure the bone graft in place.

91.     Earlier treatment would have avoided months of pain and atrophy and would have given Mr. Bryan the opportunity for a less invasive surgery.

92.     Mr. Bryan has suffered damages including physical pain and suffering, emotional distress, physical scarring, and lost enjoyment of life.

93.     Mr. Bryan also seeks punitive damages.

94.     Mr. Bryan has exhausted his administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

**COUNT I: DELIBERATE INDIFFERENCE
TO SERIOUS MEDICAL NEEDS**

95.     At all times relevant, Defendants acted or failed to act under color of state law.

96.     Defendants are persons under 42 U.S.C. § 1983.

97.     Defendants had a custom, policy, or practice of acting knowingly and with deliberate inference in denying obviously necessary medical services and medications to inmates at the Prison and the Metropolitan Detention Center, including Mr. Bryan.

98.    Mr. Bryan made several requests to see a provider for evaluation of his broken collarbone, a serious medical condition.

99.    Defendants knew of Mr. Bryan's serious medical condition.

100.    Defendants not only ignored and disregarded Mr. Bryan's obviously serious medical needs but also placed him at risk of substantial and life-long physical harm.

101.    The acts and omissions of Defendants were within the course and scope of their agency.

102.    Through the acts and omissions described herein, Defendants intentionally deprived Mr. Bryan of the securities, rights, privileges, liberties, and immunities guaranteed by the United States and New Mexico Constitutions, including the right to be free from cruel and unusual punishment.

103.    Puruant to Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015) and Colbruno v. Kessler, 928 F.3d 1155 (10th Cir. 2019) the Eight Amendment also provides additional protections to pre-trial detainees to be free from objectively unreasonable confinement conditions.

104.    Through the acts and omissions described herein, Defendants acted objectively unreasonable and deprived Mr. Bryan of the securities, rights, privileges, liberties, and immunities guaranteed by the United States and New Mexico Constitutions, including the right to be free from cruel and unusual punishment.

105.    The acts and omissions of Defendants proximately caused Mr. Bryan's injuries.

### *With Respect to Defendant Kathleen Lamphere, NP*

106.    Mr. Bryan repeatedly informed Defendant Lamphere, NP of his medical needs.

107.    Defendant Lamphere, NP was deliberately indifferent to Mr. Bryan's medical needs.

108. Defendant Lamphere, NP knew that Mr. Bryan's collarbone was obviously deformed and painful and that he had been in pain for months.

109. Defendant Lamphere, NP knew that Mr. Byran's fracture was not healing.

110. Defendant Lamphere, NP knew or should have known that both a non-healing fracture and a fracture with tenting are independent reasons that a patient must receive an urgent orthopedic consult.

111. Defendant Lamphere, NP repeatedly told Mr. Bryan that no treatment was available for his broken collarbone when this was not true and he in fact ultimately needed extensive surgery to repair his collarbone.

112. Defendant Lamphere, NP, instead of providing proper treatment, did almost the opposite, she assumed he was faking his injuries, was delusional, and confiscated his arm sling.

113. Defendant Lamphere, NP ignored the recommendation on March 5, 2020, from fellow nurse practitioner Leroy Leonard that Mr. Bryan needed an ortho referral.

114. At no time did Defendant Lamphere, NP refer Mr. Bryan to a higher level of care above herself.

### *With Respect to Defendant Keith Ivens, MD*

115. Defendant Ivens, MD had a responsibility to care for the inmates of the Prison and to supervise the care provided by lower level providers.

116. On information and belief, Defendant Ivens, MD never evaluated Mr. Bryan for any reason.

### COUNT II: FAILURE TO TRAIN AND SUPERVISE

117. Administration, management, and operation of a prison are traditionally state functions.

13

118.   Upon information and belief, Defendant CoreCivic was under contract with the State of New Mexico to administer, manage and operate the Prison and to house inmates such as Mr. Bryan.

119.   Upon information and belief, Defendant Centurion was under contract with Bernalillo County to provide and manage medical services for inmates such as Mr. Bryan at Metropolitan Detention Center.

120.   Defendant CoreCivic hired Defendant Chad Miller as warden and, upon information and belief, hired Defendant Ivens, MD as head of the health services and medical and hired Defendant Kathleen Lamphere, NP (Defendants Miller, Ivens, MD, and Lamphere, NP, collectively "Individual Defendants") at the Prison, knowing that Defendants Ivens, MD and Lamphere, NP had inadequate experience and training in the administration of the health services and medical centers, and knowing that Defendant Miller had inadequate experience and training in the administration of the faculty and facilities at the Prison.

121.   Given Individual Defendants' inexperience and lack of training in medical unit administration, and that Defendant CoreCivic knew that the failure to properly administer the medical unit, including procuring adequate medical treatment for inmate injuries, could be life-threatening to inmates with serious medical conditions, it was foreseeable that there would be safety, civil rights, and administrative violations at the Prison.

122.   Defendant CoreCivic, therefore, had reason to believe that hiring Individual Defendants would create an unreasonable risk of harm to Prison inmates such as Mr. Bryan.

123.   Defendant CoreCivic failed to adequately train, supervise, or terminate the employment of Individual Defendants even though it knew or had reason to know that the failure

14

to adequately administer the Prison medical unit was likely to deprive inmates like Mr. Bryan of their Eighth Amendment rights.

124. Defendant CoreCivic knowingly hired individuals, including Individual Defendants, who did not possess the requisite training and experience to properly operate and administer the medical unit at the Prison or to appropriately respond to medical urgencies.

125. Defendants CoreCivic, Miller, Lamphere, NP, and Ivens, MD were deliberately indifferent to the obvious, serious medical needs of Mr. Bryan, knowing that their failure to properly hire, train and supervise their employees could cause Mr. Bryan potentially life-long physical injury and suffering. Defendant CoreCivic could have and should have pursued reasonable methods for the training and supervising such employees, but failed to do so.

126. Defendant CoreCivic's policies, customs, or usages in failing to properly train and supervise its employees were the moving forces and proximate cause of the violation of Mr. Bryan's Eighth Amendment rights.

127. The acts or omissions of Defendant CoreCivic caused Mr. Bryan damages in that he suffered serious physical and mental pain during the time he was without medical care and into the future.

**COUNT III: STATE LAW CLAIM
FOR MEDICAL MALPRACTICE**

128. All named Defendants herein had a duty to provide reasonable medical care and treatment to inmates and detainees, including Mr. Bryan, at the Prison (CoreCivic and Individual Defendants) and MDC (Centurion).

129. All named Defendants breached their duty of care and were negligent when they failed to provide Mr. Bryan with reasonably obtainable and necessary follow-up medical treatment.

130.    Individual Defendants were at all times relevant hereto employees and agents of Defendant CoreCivic.

131.    Individual Defendants acted on their own behalf and on behalf of Defendant CoreCivic when they committed the acts giving rise to the claims against them contained in this Complaint and which may later be learned of through discovery.

132.    Defendant CoreCivic is liable to Mr. Bryan for any harm caused by agents acting on its behalf.

133.    Defendant Centurion is liable to Mr. Bryan for any harm caused by agents acting on its behalf.

134.    Defendants' negligence proximately caused Mr. Bryan significant physical and mental pain and suffering and other damages.

**COUNT IV: STATE LAW CLAIM**
**FOR FAILURE TO TRAIN AND SUPERVISE**

135.    Defendants CoreCivic and Centurion had a duty to exercise reasonable care in the hiring, training, and supervision of their employees in a manner that would provide the inmates under their care with reasonable medical care and treatment.

136.    Defendants CoreCivic and Centurion knew or should have known that the employees they hired, including, with respect to Defendant CoreCivic, Defendants Miller, Lamphere, NP and Ivens, MD, lacked adequate training and experience to provide the Prison and MDC inmates with reasonable medical care and treatment.

137.    Defendants CoreCivic and Centurion, because they knew or should have known of the lack of supervision, experience and training among their employees, also had reason to know that their employees were likely to harm the Prison and MDC inmates in need of medical care and prompt medical treatment, including Mr. Bryan.

138.    In failing to exercise reasonable care in the hiring, training, and supervision of its employees relative to their ability to provide reasonable medical care and treatment, Defendants CoreCivic and Centurion were negligent.

139.    The negligence of the Defendants CoreCivic and Centurion proximately caused Mr. Bryan significant physical and mental pain and suffering and other damages.

**REQUEST FOR RELIEF**

Plaintiffs respectfully requests the Court award:

A. Judgment jointly and severally against all Defendants on all claims;

B. Monetary damages, including punitive damages, in an amount to be determined at trial for the mental and physical damages, loss of enjoyment of life, and permanent disfigurement;

C. Mr. Bryan's attorneys' fees, costs, and expenses in bringing this lawsuit;

D. Pre- and post-judgment interest from the date of the incident;

E. Any other and further relief the Court deems just and proper.

Respectfully submitted,

GARRETT & SMITH LAW

By:    /s/ *Taylor E. Smith*
Taylor E. Smith
6739 Academy Rd NE #350
Albuquerque, NM 87109
(505) 242-1920
Taylor.garrettlaw@gmail.com

-and-

SHEKTER LAW, P.C.

Jamison Shekter
1306 Rio Grande Blvd NW, Suite B
Albuquerque, NM 87104
(505) 216-2510
jamison@shekterlawfirm.com